UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| L.S. AND MR. AND MRS. F.S. : | |
| : | NO.:  3:02CV1386 (SRU) |
| : | |
| v. : | |
| : | |
| NEW FAIRFIELD HIGH SCHOOL, : | |
| NEW FAIRFIELD BOARD OF : | |
| EDUCATION, CHRIS HOFFMAN AND : | |
| JOSEPH GALLUCCI, IN THEIR : | |
| OFFICIAL CAPACITY : | AUGUST 3, 2005 |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**</u>

**I.    BACKGROUND AND FACTS**

**A.  Allegations of Complaint**

Plaintiff brought this action by complaint dated August 7, 2002 against the New

Fairfield High School, New Fairfield Board of Education, Chris Hoffman and Joseph

Gallucci, in their official capacity[1].  The Complaint alleges defendants violated

plaintiff's rights under Title IX, 20 U.S.C. § 1681, et seq. because she suffered peer

sexual harassment during her freshman year at New Fairfield High School.  The

complaint also alleges a violation of her right to a "safe educational environment",

which claim is brought pursuant to 42 U.S.C. §1983.  Plaintiff also brings common law

claims for intentional infliction of emotional distress and negligent infliction of emotional distress.

Plaintiff, L.S., was a 9th grade student at New Fairfield High School during the 2000-2001 school year.  Her Complaint details instances of conflicts with several of other NFHS students, as follows:

- In the summer of 2000, prior to the beginning of the school year, L.S. received threatening emails. Complaint,  ¶8;
- On October 29, 2000, Lindsey D'Angelo, another female student began contacting L.S. [at home] after she had learned that L.S. was seeing Lindsey D'Angelo's ex-boyfriend, yelling profanities and threatening her life. Id.,¶9;
- On October 30, 2000, L.D. and her friends were outside the school office, where L.S. was telling the administration about the phone calls.  Rachel Rodriguez said to plaintiff, "you messed with the wrong person." Id., ¶9;
- On the same date, Lindsey D'Angelo and L.S. had a physical altercation, with L.D. pushing L.S and threatening to kill L.S.  L.D. yelled at L.S. again in front of Assistant Principal Suchy Id.,¶10.  Lindsey D'Angelo called L.S. at home apologetically and said she would leave her alone if L.S. took back what she said to administrators. Id.,¶10
- On November 2, 2000, L.S.'s locker was vandalized and books were taken from her locker. Id.,¶12;
- On November 3, 2000, Lindsey D'Angelo yelled profanities and verbally harassed and threatened her. Id.,¶13;
- Over the winter of 2000-2001, another student, Katie Johnson, was suspended for physically threatening L.S. Id.,¶17;
- In March 2001, a male student, Josh Norris, yelled at the plaintiff and pushed her against the wall and Josh was suspended. Id., ¶18;
- On March 29, 2001, L.S. received threatening emails from Tara Richarei, a female student who was friends with plaintiff's ex-boyfriend, Josh. Id.,¶21;

---

[1] As plaintiff only alleges official capacity claims, the complaint is construed as brining only claims against the entity, New Fairfield Board of Education.

- In April 2001, Mandy Hayes and her friend Melissa sent threatening and vulgar emails. Id., ¶ 22;
- On May 18, 2001, sexually explicit fliers were circulated and posted throughout the school, with a picture of L.S. and her best friend, Nicole Marvin. Id., ¶23.

The Complaint also alleges that the plaintiff missed school, was tardy and her grades suffered significantly. Id.,¶25-26. She also claims she was never advised of the existence of any sexual harassment policy. Id., ¶ 24, 32.

During her deposition, plaintiff also alleged she was harassed by Katrina Russell, but they later worked out their difficulties. **Exhibit A**, p. 18-19.

B.  Evidence Regarding Incidents and School District Response

The defendants deposed L.S. and her mother, J.S.  **Exhibit A**, Deposition of L.S. and **Exhibit B**, Deposition of J.S.  Defendants also deposed the main perpetrators of plaintiff's claims harassment, as testified to by L.S: Lindsey D'Angelo, Josh Norris and Mandy Hayes.  **Exhibit C,** Deposition of Lindsey D'Angelo, **Exhibit D**, Deposition of Josh Norris, and **Exhibit E**, Deposition of Mandy Hayes.  The evidence shows, as admitted by the plaintiff, that L.S. was part of a love triangle (or L.S. was at least perceived by the other girls as a threat) or the harasser was L.S.'s boyfriend/ex-boyfriend (such as in Josh's case.)  **Exhibit A**, pp. 7-8, 13-15, 16-17, 21-22, 33-34, 37. The other explanation offered by the plaintiff for her mistreatment was that she was very pretty and received attention from the older boys in school.  **Exhibit B**, pp. 30, 35-36.  This sparked jealousy by the older girls.  Id. at 57.  Plaintiff's best friend Nicole

testified that there were about eight or nine incidents.  **Exhibit J**, Deposition of Nicole Marvin, p. 9.  All of the students but one identified by the plaintiff were upperclassmen or not in the 9th grade.  **Exhibit A**, p. 63.  All of the students save one were not in any of L.S.'s classes.  Id.  In addition, plaintiff engaged in similar behavior with the other students, using profanity and other slurs.  **Exhibit D**, p. 14-16; **Exhibit J**, p. 59-60.  As the deposition testimony of the Principal, Dr. Joseph Gallucci and Asst. Principal Paul Hoffman attest, the administration responded to the plaintiff's complaints.  **Exhibit F**, Deposition of Dr. Gallucci and **Exhibit G**, Deposition of Paul Hoffman.  The administration also drafted a chronology of incidents and their response.  See, **Exhibit H**.  At the least, an investigation was conducted into each of plaintiff's complaints presented to the administration.  Students were interviewed, parent meetings held, detentions and suspensions were given.  Defendants' Local Rule 56a1 Statement, citing, **Exhibits A-H, J**.  However, sometimes despite investigation, the administration was unable to confirm plaintiff's allegations, and the plaintiff would offer no concrete evidence which pointed to a particular student for the administration to discipline. **Exhibit F**, p. 33-36; 55, 60; **Exhibit J**, p. 16.  This specifically occurred with the locker incident and the poster incident and one incident with Lindsey.  Id.

1. Deposition of Paul Hoffman

Mr. Hoffman testified regarding his involvement with the issues plaintiff was experiencing.  Mr. Hoffman was the assistant principal for the high school during 2000-

2001 school year.  **Exhibit G**, p. 8.  He was employed by the school district for 33

years, having begun as a classroom teacher.  Id., p. 7-8.  Mr. Hoffman received

ongoing training with regard to evaluation and supervision of the professional staff,

special education, and annual training in sexual harassment.  Id., p. 12-13.  Hoffman

has also received sexual harassment training.  Id., p. 87-88.  With regard to the school

district's Title IX policy, the students were informed of it in the handbook and during

the first day of orientation.  Id., p. 63.  The plaintiff's parents did not ask for the policy

prior to November 2001. Id., p. 64.  He provided the policy in response to Mr. S's

request.  **Exhibit L**, Letter from Mr. S requesting Title IX policy dated October 18,

2001; **Exhibit M**, Memo to Mr. S from Mr. Hoffman enclosing Title IX policy dated

November 1, 2001.  He also testified that school administrators have discretion in

enforcing discipline policies.  **Exhibit G**, p. 66.

     A. Emails prior to school

     Mr. Hoffman recalls meeting with Mrs. S over concerns about plaintiff's

transition into high school due to some social difficulties in middle school.  Id., p. 14-

15.  He was not shown any emails.  Id., p. 15-18.  Mr. Hoffman thought that the plaintiff

had been picked on by high school kids while she was in middle school and her

parents wanted him to be aware of that.  Id., p. 19.  He did not recall that the parents

relayed any "threats" by another student.  Id.,  p. 24.  Although he told the parents he

would advise the plaintiff's teachers about their concerns of being teased by high schoolers in middle school, but did not end up doing so.  Id.,  p. 26-27.

### B. Incidents with Lindsey

Mr. Hoffman also recalls that in the fall he became aware that there was an incident involving plaintiff and a student named Lindsey while he was away from campus.  Id., p. 35-36.  When he returned he talked with the teacher that was in charge of the building about that incident.  Id., p. 36.  The school officer, Officer Farina had informed Lindsey and her parents that she would be excluded from school until the administration talked to her.  Id., p. 37.   Mr. Hoffman recalls a meeting with plaintiff, Lindsey and The plaintiff's parents with his intent being to bring the girls together and see if he could mediate some kind of settlement to find out what the bad blood was.  Id., p. 21-43.

### C. Graffiti

Mr. Hoffman recalls that there was a graffiti problem with references to plaintiff which was presented to him later in the school year.  Id., pp. 55-56.  He does not recall, however, being asked to investigate it.  Id., p. 59.

### D. Incident with Katie

With regard to the incident with Katie Johnson, she was disciplined by Mr. Hoffman.  Id., p. 72. She was given a suspension.  **Exhibit H**, Complaint.

E. Josh Norris

Josh Norris, plaintiff's former boyfriend, was also disciplined for an incident with the plaintiff, in the form of a suspension.  Id., pp. 73, 102.

F.  The Poster Incident

Mr. Hoffman was called upon by Dr. Gallucci to investigate a poster that was posted in the school showing the plaintiff and her friend Nicole, which included profane language.  The administrators pointed their investigation toward Mandy Hayes., but were unable to find any witnesses or conclusive evidence against her to warrant discipline.  Id., pp. 79-80; 100-101.  The investigation included interviewing students, interviewing Mandy extensively and attempting to get the police report from the state police.  Id., p. 100-101; **Exhibit N**, Letter to Susan Ravoir from Dr. Gallucci.  However, the police denied the administration the police report.  Id., p. 101;  **Exhibit O**, Letter from Susan Ravoir to Dr. Gallucci.

G. Food Thrown at the plaintiff

Mr. Hoffman was not aware of circumstances where the plaintiff was thrown food at.  Id., p. 71.

2. Deposition of Dr. Joseph Gallucci

Dr. Gallucci was the principal at New Fairfield High School for one year, the 2000-2001 school year.  **Exhibit F**, p. 10.  Prior to that time he was the principal of the Lyman Memorial High School from 1978 to 2000.  Id., p. 11.  While the principal at

New Fairfield, Dr. Gallucci maintained an open door policy.  Id., p.16  If someone had a concern, he would try to meet with them that day.  Id.  He has had training in sexual harassment numerous times.  Id., p. 20.  He recalls the plaintiff from when he was principal.  Id., p. 24.

Whenever L.S. had an issue, she would call home first before letting the administration know about a complaint.  Id., p. 60  This is the only case he's seen where the student would call home first.  Id., p. 63. Their modus operandi was to have the father come down and demand that someone be arrested.  Id.. Mr. S also met with the Superintendent and Dr. Gallucci in late May or early June 2001.  Id., p. 29-30.  Dr. Gallucci was in attendance. Id., See also, **Exhibit H**.  Dr. Gallucci would meet with Mr. S when he called to schedule a meeting or came in unannounced.  Id., p. 30, 36. p. 55 another incident with Lindsey, no evidence or witnesses.  Id., p. 55.

There was training held on anti-bullying that year, because new Fairfield was one of the leaders leading the cause of anti-bullying.  Id. at 85-86.  Dr. Gallucci believed that  the plaintiff initiated consternation with other students and other students created problems with her.  Id., p. 93.  He believes the remedial measures were effective.  Id., p. 94.  It was also normal to see students, including the plaintiff, helping a secretary with administrative tasks.  Id., p. 95.  Other students also helped the secretary.  Id.

A. Incidents with Lindsey

Dr. Gallucci recalled the initial incident between the plaintiff and Lindsey in October 2000. Id., p. 24-25. The administration was attending an off campus seminar. Id. The Assistant Principal's phone rang and he and the other assistant principal returned to school to investigate. Id., p. 25. At that time, Assistant Principal Hoffman determined to give a strong warning to Lindsey. Id., p. 25. Dr. Gallucci personally met with L.S. about issues she had. Id., p. 26. However, in most cases, the plaintiff's father would come see Dr. Gallucci. Id. Mr. S complained to Dr. Gallucci about the meeting he attended when Mr. Hoffman was trying to mediate between the plaintiff and Lindsey, at which meeting Mr. Hoffman used profanity. Id. Based upon this complaint, Dr. Gallucci spoke with Mr. Hoffman and expressed that he did not condone that type of verbiage. Id., p. 27. Mr. Hoffman agreed his behavior was inappropriate at that time. Id., p. 27. See also **Exhibit U**, Memo to Dr. Matusiak from Dr. Gallucci dated 11/17/00. Mr. S was also concerned that Lindsey had not been given any sterner discipline, and Dr. Gallucci agreed. Id., p. 28 He advised both Mr. Hoffman and the superintendent Dr. Matusiak that in his opinion, Lindsey should have been suspended. Id., p. 28; **Exhibit U**. Mr. Hoffman, in retrospect, agreed. Id. However, due to the fact that another week had transpired, and there were no further reports about Lindsey, the administration determined Lindsey should not be suspended at that time. Id., p. 29; **Exhibit U.**

9

B Josh Norris incident

Dr. Gallucci also recalls the incident with Josh Norris.  Id., p. 31.  His recollection is that she was waiting for him in the hallway and she made comments to him.  He made comments back.  She rushed him and Josh pushed her back. Id.  The plaintiff immediately called her father, and Mr. S arrived, walked into Dr. Gallucci's office and demanded that Josh be arrested.  Id.  Dr. Gallucci investigated the incident for the next couple of hours, including the plaintiff, Josh and several witnesses.  Id., p. 31.  Josh was arrested.  Id., p. 32.

C. Poster incident

He also recalled the poster incident.  Id.  Mr. S again arrived to school and demanded that a student be arrested.  Id.  Mr. S identified a couple of names for the administration to interview, which was done.  Id., p. 33.  Those students, however, reported that they did not see anything.  Id.  Dr. Gallucci questioned the suspected student who put up the poster and also met with her parent.  Id., p. 33.  The parent advised that she wanted a lawyer present and told Dr. Gallucci he was violating her [daughter's] rights.  Id.  Mr. S said he would get an email that was sent to the plaintiff. However, he never produced any email.  Id., p. 34.  The police also investigated the poster incident, and Dr. Gallucci attempted to get the police report.  Id.; See also **Exhibit N**. However, Dr. Gallucci was advised by the state police that he would not be permitted to review the report due because it was a violation of state statute, as the

10

accused was a minor.  Id., p. 35-36; **Exhibit O**.  He advised Mr. S he was denied

access.  Id., p. 36; **Exhibit P**.

D. Emails

Dr. Gallucci had not seen the emails identified by the plaintiff.  **Exhibit F,** p. 38.

The plaintiff did not report the emails received in March or April 2001 to the

administration.  Rather, they got the police involved.  **Exhibit B**, p. 102-104.

E.  L.S. Online Profile

However, Dr. Gallucci did recall L.S. and her best friend, Nicole's, profiles.  Id.,

p. 39.  He asked Mr. S to come to the office and L.S. was also in attendance, and

admitted to making the profile.  Id., p. 40.  The profile included the phrase

"Cheerleaders are dancers gone retarded." **Exhibit K**, Profile.   Her friend Nicole had

written some sexual innuendos about the upper classmen.  Id., p. 40; **Exhibit K**.

These included that the upper classmen girls were skanks and whores.  **Exhibit K.**

During that school year, Dr. Gallucci had also received complaints about the plaintiff's

best  friend Nicole had performed oral sex for football players.  Id., p. 97.

F. Locker incident.

Dr. Gallucci recalled Mr. S came in unannounced and said that he wanted a

student arrested for breaking into her locker and throwing his daughters books around

the city.  Id., p. 44.  Mr. S thought Lindsey had done it, but after the investigation, the

administration was unable to confirm it. <u>Id.</u>, p. 44-45. There was no evidence provided to the administration. <u>Id.</u>, p. 60.

### G. Graffiti

At a meeting with the Superintendent and Dr. Gallucci near the end of the school year, Mr. S expressed there was graffiti in the bathroom. **Exhibit H**. Dr. Gallucci removed the graffiti himself and what ever else was there on the bathroom walls. **Exhibit F**, p. 46. Mrs. S thanked him for taking care of it so quickly. <u>Id.</u>, p. 59. After he sprayed the graffiti, he brought a custodian to the bathroom and showed him and instructed the custodian to check it every day. <u>Id.</u>, p. 98. Dr. Gallucci also checked it everyday until school ended. <u>Id.</u> Earlier in the year, Assistant Principal Dickau had informed the custodians to remove it, and was advised that it had been removed. **Exhibit H**.

### 3. Deposition of Lindsey D'Angelo

Lindsey could not recall much about that year in high school, except that she dated Jesse for 2 years on and off. **Exhibit C**, Deposition of Lindsey D'Angelo, pp. 14-15. She did recall that she didn't like the plaintiff, however. <u>Id.</u>, p. 44

### 4. Deposition of Josh Norris

Plaintiff had conflicts with Josh Norris, her on again, off again, boyfriend. **Exhibit D**, Deposition of Josh Norris, pp. 9-10, 17-20, 27. They really knew how to "piss each other off". <u>Id.</u>, p. 27. When asked why he said hurtful things to the plaintiff,

he replied, "love works in mysterious ways." <u>Id.</u>, p. 28. He thought a lot of L.S.'s peer

problems were because she was unpleasant to people and brought it on herself. <u>Id.</u>,

p. 24. She would constantly report him to the administration if he even looked her

way. <u>Id.</u>, pp. 14-17, 35-37. He received detentions and a suspension. <u>Id.</u>, pp. 15, 37.

There was a conflict between the plaintiff and Tara because they dated the same boy.

<u>Id.</u>, p. 46. The plaintiff would call Josh asshole, scumbag, cock, or anything she could

think of. <u>Id.</u>, p. 55. She also called other students, including Lindsey, a bitch or whore.

<u>Id.</u>, p. 56. Girls the plaintiff did not like she would call names, which included just

about every girl except her best friend, Nicole. <u>Id.</u>, p. 56. She may have had problems

impart because she was giving Josh a hard time. <u>Id.</u>, pp. 58-59. They exchanged

words everyday. <u>Id.</u>, p. 27.

     5. <u>Mandy Hayes</u>

     Mandy denied at the time and still denies any involvement with the posters of

the plaintiff. **Exhibit E**, Deposition of Mandy Hayes, p. 29-30. She was, however,

investigated by the administration, along with numerous other students including

Lindsey. <u>Id.</u>, pp. 18-21. She was not in any of the plaintiff's classes. <u>Id.</u>, pp. 14-15.

**II.**    <u>**LAW AND ARGUMENT**</u>

    **A.**    <u>**Standard for Summary Judgment**</u>

     The trial court's task at the summary judgment motion stage of the litigation is

carefully limited to discerning whether there are genuine issues of material fact to be

tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Channer v. Murray, 2005 WL 752201, *1 (Conn.,2005)(Underhill, J. ), citing, Gallo v. Prudential Residential Servs. L.P., 22 F.3d 1219, 1224 (2d Cir.1994). The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Id, citing, Rule 56(c), Fed.R.Civ.P.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir.2002) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Not all factual disputes are material. The court considers the substantive law governing the case to identify those facts that are material. "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact....' " Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). An asserted dispute over a material fact is considered "genuine," so as to defeat the motion for summary judgment, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." McCarthy v. American Int'l Group, Inc., 283 F.3d 121, 124 (2d Cir.2002).

Even though the burden is on the moving party to demonstrate the absence of any

genuine factual dispute, the party opposing summary judgment "may not rest upon

mere conclusory allegations or denials, but must bring forward some affirmative

indication that his version of relevant events is not fanciful." Podell v. Citicorp Diners

Club, Inc., 112 F.3d 98, 101 (2d Cir.1997) (internal quotation marks and citations

omitted). He " 'must do more than simply show that there is some metaphysical doubt

as to the material facts." ' Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002)

(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106

S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The non-moving party "may not rely on conclusory

allegations or unsubstantiated speculation." Fujitsu Ltd. v. Federal Express Corp., 247

F.3d 423, 428 (2d Cir.2002) (internal quotation marks and citation omitted). Instead,

the non-moving party must produce admissible evidence that supports its pleadings.

See First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289-90, 88 S.Ct. 1575,

20 L.Ed.2d 569 (1968). The " 'mere existence of a scintilla of evidence' supporting the

non-movant's case is also insufficient to defeat summary judgment." Niagara Mohawk

Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir.2003) (quoting

Anderson, 477 U.S. at 252).

      In reviewing a motion for summary judgment the court resolves all ambiguities

and draws all inferences in favor of the nonmoving party. Id. at 2, citing, See Niagara

Mohawk, 315 F.3d at 175. Thus, "[o]nly when reasonable minds could not differ as to

15

the import of the evidence is summary judgment proper." <u>Bryant v. Maffucci</u>, 923 F.2d

979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

**B.    <u>Summary of Argument.</u>**

Plaintiff's claim is basically that the school administration did not punish the

alleged harassers with sufficient severity and did not end the harassment.  Plaintiff's

father, on numerous occasions, would demand that the school have the accused

arrested.  Plaintiff is unable to meet her burden under Title IX to recover money

damages against the New Fairfield School District.  Title IX requires that a plaintiff

suffer discrimination, "on account of gender", that is so pervasive and severe so that

the plaintiff is denied educational benefits.  In addition a plaintiff must show that the

administrations response to incidents of sexual harassment of which it had actual

notice was deliberately indifferent or so clearly unreasonable in the light of known

circumstances.  It is not the Court's role to revisit the disciplinary decisions made by

school officials on a daily basis.  While the plaintiff's freshman year was distressing to

her, she cannot recover money damages against the defendants.  The administration

investigated plaintiff's complaints and meted out varying measures of discipline.

**C.    <u>The Plaintiff Has not Met Her Burden Under Title IX for Sexual Harassment.</u>**

In Count One, plaintiff alleges that the defendants are liable under Title IX for

the harassment she endured by other students attending New Fairfield High School.

16

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

In the seminal case of Davis v. Monroe, 526 U.S. 629 (1999), the U.S. Supreme Court, by a 5-4 vote, held in limited circumstances a school district may be liability for student-on- student sexual harassment under Title IX.  A defendant is liable where it is deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school. Id. at 650.  The issue before the Court was whether a recipient of federal education funding may be held liable for damages under Title IX under any circumstances for discrimination in the form of student-on-student sexual harassment.  Id. at 649.  Davis made clear that school districts must be in a position to have authority over the accused:

> This is not to say that the identity of the harasser is irrelevant. On the contrary, both the 'deliberate indifference' standard and the language of Title IX narrowly circumscribe the set of parties whose known acts of sexual harassment can trigger some duty to respond on the part of funding recipients.  Deliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment.  A recipient cannot be directly liable for its indifference where it lack the authority to take remedial action…

17

The statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs.  If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment.  That is the deliberate indifference must at a minimum, 'cause [students] to undergo] harassment or make them liable or vulnerable to it…. Moreover, because the harassment must occur "under" the operations of' a funding recipient, see 20 U.S.C. 1681(a); 1687 (defining program or activity' the harassment must take place in a context subject to the school district's control…..

These factors combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs.

The conduct in <u>Davis</u> occurred in the classroom during school hours.  <u>Id.</u> at 646.

The Court held that school districts may be liable for "subjecting" their students to discrimination where the district is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority.  <u>Id.</u> at 647.  However, perfection is not mandated.  <u>Davis</u> does not hold that "recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular action."  <u>Id.</u> at 648. Courts must refrain from second guessing the disciplinary decisions made by school administrators.  <u>Id.</u>  The school must act in a manner that is not clearly unreasonable. This is not a reasonableness standard.  <u>Id.</u>  Peer harassment is less likely to meet the standard than teacher-student harassment.  <u>Id.</u>  The Court recognized that students "often engage in insults, banter, teasing, shoving, pushing and gender-specific conduct

that is upsetting to the students subjected to it." Under these standards, plaintiff's claims regarding emails she received and instances that occurred out of school and not on school property, and without notice, cannot serve as a basis for Title IX liability. Id.

The plaintiff has also detailed several specific instances of conduct at school. However, the occurrence of these discrete incidents at school does not end the analysis.  The plaintiff's Title IX claim still fails in several respects, as set forth below.

1. "On account of" Gender

Plaintiff alleges harassment both by male and female students.  As an initial matter, "there is a substantial threshold question in this case whether the alleged harassment of Plaintiff can properly be characterized as sexual harassment within the meaning and scope of Title IX." Burwell v. Pekin Community High School Dist. 303, 213 F.Supp.2d 917 (C.D.Ill.,2002.),citing C.R.K. v. U.S.D. 260,176 F. Supp.2d at 1163; Manfredi v. Mount Vernon Bd. of Educ., 94 F.Supp. 2d 447, 453-56 (S.D.N.Y. 2000). In order to be actionable, the offensive behavior must be based on sex rather than personal animus or other reasons.  See, Frazier v. Fairhaven School Committee, 276 F.3d 52, 66 (1st Cir. 2002); Benjamin v. Metropolitan Sch. Dist. of Lawrence Township, 2002 WL 977661, Docket # 1 P 000891-C-T/K (S.D. Ind. 2002)(**Attached as Exhibit R**).  While the Supreme Court has not yet recognized same sex peer harassment in

the Title IX context, the First Circuit has.  <u>Frazier</u>, supra.  The First Circuit relied on a

case In the Title VII context, where the U.S. Supreme Court held that same sex

harassment could be actionable, but the plaintiff must generally show: (1) the conduct

must be motivated by sexual desire, (2) such sex-specific and derogatory terms as to

make it clear that the harasser is motivated by general hostility to one sex, or (3) direct

comparative evidence about how the alleged harasser treated members of both sexes.

<u>Oncale v. Sundowner Offshore Servs.</u>, 523 U.S. 75, 80-81 (1998).  The conduct at

issue in this case fails to meet any of these standards.

The U.S. Supreme Court in <u>Oncale</u> explained that the discrimination laws are

not a "general civility code."  <u>Id.</u> at 80.  It explained:

> Respondents and their *amici* contend that recognizing liability for same-sex
> harassment will transform Title VII into a general civility code for the American
> workplace. But that risk is no greater for same-sex than for opposite-sex
> harassment, and is adequately met by careful attention to the requirements of
> the statute. Title VII does not prohibit all verbal or physical harassment in the
> workplace; it is directed only at "*discriminat [ion]* ... because of ... sex." We have
> never held that workplace harassment, even harassment between men and
> women, is automatically discrimination because of sex merely because the
> words used have sexual content or connotations. "The critical issue, Title VII's
> text indicates, is whether members of one sex are exposed to disadvantageous
> terms or conditions of employment to which members of the other sex are not
> exposed." *Harris, supra,* at 25, 114 S.Ct., at 372 (GINSBURG, J., concurring).
> Courts and juries have found the inference of discrimination easy to draw in
> most male-female sexual harassment situations, because the challenged
> conduct typically involves explicit or implicit proposals of sexual activity; it is
> reasonable to assume those proposals would not have been made to someone
> of the same sex. The same chain of inference would be available to a plaintiff
> alleging same-sex harassment, if there were credible evidence that the
> harasser was homosexual. But harassing conduct need not be motivated by

20

sexual desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace. A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace. Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "*discrimina[tion]* ... because of ... sex."

 And there is another requirement that prevents Title VII from expanding into a general civility code: As we emphasized in *Meritor* and *Harris,* the statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview." *Harris,* 510 U.S., at 21, 114 S.Ct., at 370, citing *Meritor,* 477 U.S., at 67, 106 S.Ct., at 2405-2406. We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace--such as male-on-male horseplay or intersexual flirtation--for discriminatory "conditions of employment."

We have emphasized, moreover, that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." *Harris, supra,* at 23, 114 S.Ct., at 371. In same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field--even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words

used or the physical acts performed. Common sense, and an appropriate
sensitivity to social context, will enable courts and juries to distinguish between
simple teasing or roughhousing among members of the same sex, and conduct
which a reasonable person in the plaintiff's position would find severely hostile
or abusive.

Id. at 80-82.

These demanding standards should be applied with rigor in the Title IX context,

as it is more difficult to prove a Title IX case against a school district than a Title VII

case against an employer.  See, Davis, supra.  This Court would not be the first to find

that the alleged conduct did not constitute gender discrimination.  Numerous courts

have held that conflicts between persons who have had a romantic relationship

subsequent to a break up is not sexual harassment—either in the Title IX or Title VII

context.  This is because the conflict is usually rooted in personal animus or hurt

feelings—not on account of gender.  For example, in Benjamin, supra, the factual

scenario is almost identical to the present case.  The plaintiff, a female student, and

the alleged harasser, a male student, had a one year relationship.  After the

relationship ended, the boy and his friend started calling the plaintiff "bitch", "slut" and

"whore" in the hallway at school.  During that fall, female students also "jumped on the

bandwagon" and called the plaintiff names.  The name calling continued, until the

plaintiff withdrew from school in January.  The Court succinctly explained:

In this case, the harassment started as a result of Cameron and Justin's break
up.  Plaintiff has presented no evidence that the slurs were the result of
Cameron's gender.  The phrases "bitch, "whore," and "slut", although upsetting

22

do not appear to be based on gender bias, but rather Hall and his friends' personal animosity against Cameron.  As the Seventh Circuit noted in Galloway.  'The repetition of the term [sick bitch] together with the verbal conduct that is alleged reflected and exacerbated a personal animosity arising out of the failed relationship rather than anything to do with a belief by [the alleged harasser], of which there is no evidence, that women do not belong in the work force or are not entitled to equal treatment with male employees.  In these circumstances no inference could be drawn by a reasonable trier of fact that [the harasser's] behavior, undignified and unfriendly as it was, created a working environment in which [the victim] could rationally consider herself at a disadvantage in relation to her male coworkers by virtue of being a woman.' 78 F.3d at 168.  There is simply no harassment based on sex for the purposes of Title IX.  Id. at *3.

The Court also rejected the claim that the harassment occurred because of Justin's sexual desire for Cameron. Id.  In this case, the plaintiff's problems with Josh were related to their on again off again relationship during that year.  **Exhibit D**, p. 28 When Josh was questioned as to his intent behind his hurtful comments, he replied that "love works in mysterious ways." Id.  The issues with Josh occurred while the plaintiff and he were on the outs.  Id., p. 17.  In addition, the plaintiff would frequently engage in the same behavior, directing her comments to him, calling him things like "cock" or other offensive terms.  Id., p. 55.  While plaintiff's complaint paints herself as the unprovoking victim, she seems to have had personality conflicts with many students, and was also participating in the exchanges.  Id.,55-56.  There is no actionable sexual harassment against the school district for plaintiff's conflicts with her ex-boyfriend.

Similarly, in a Title VII case, the Seventh Circuit held that conflict between two employees who had had a romantic relationship including the male calling the plaintiff a "sick bitch" did not constitute harassment on account of gender. Galloway v. General Motors Services Parts Operations, 78 F.3d 1166 (7th Cir. 1996)(abrogated on other rounds, National R.K. Passenger Corp. v. Morgan, 536 U.S. 101 (2002)  Judge Posner held:

> The repetition of the term [sick bitch] together with the other verbal conduct that is alleged reflected and exacerbated a personal animosity arising out of the failed relationship rather than anything to do with a belief by Bullock, of which there is no evidence, that women do not belong in the work force or are not entitled to equal treatment with male employees. In these circumstances no inference could be drawn by a reasonable trier of fact that Bullock's behavior, undignified and unfriendly as it was, created a working environment in which Galloway could rationally consider herself at a disadvantage in relation to her male coworkers by virtue of being a woman.  The case was therefore properly dismissed.

Cases in this circuit are in accord that personal dislike or animus does not constitute gender discrimination. Fisher v. Vassar Coll., 114 F.3d 1332, 1337 (2d Cir. 1997) (noting that an employer may take adverse employment action against an employee for any "reason that is non-discriminatory but unbecoming or small-minded, such as back-scratching, log-rolling ... spite or personal hostility"), *abrogated on other grounds,* Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 147-8 (2000).

Courts have repeatedly granted summary judgment where the evidence points, not to gender or racial animus, but rather to the fact that plaintiff's personality is the

motivation for the harassment. See, e.g., <u>Alfano v. Costello</u>, 294 F.3d 365, 378 (2d Cir. 2002) (reversing district court and granting defendants' motion for judgment as a matter of law on hostile environment claim in part because plaintiff could adduce no evidence that her supervisor "disliked [plaintiff] because she was a woman," and the evidence showed instead "that he disliked [her] personally"); <u>Figueroa v. City of New York</u>  2002 WL 31163880, *3 (S.D.N.Y.,2002)(Attached as **Exhibit V**), *affirmed by summary order*, 118 Fed. Appx. 524 (2d. Cir 2004), citing <u>Kodengaga v.. Int'l Bus. Mach. Corp</u>., 88 F.Supp.2d 236, 243 (S.D.N.Y.2000) (dismissing hostile work environment claim where, *inter alia,* evidence showed that the hostility plaintiff encountered "largely reflected a clash of personalities rather than discriminatory animus"); Padob v. Entex Invo. Serv*., 960 F. Supp. 806, 810, 813, 960 F.Supp. at 813(S.D.N.Y.1997)(dismissing sexual harassment claim for lack of evidence as to gender bias where plaintiff had an "acknowledged personality conflict" with her supervisor); See also,  <u>Vore v. Indiana Bell Tel. Co</u>*., 32 F.3d 1161, 1162 (7th Cir.1994)("If the workplace is unsavory for any reason other than hostility generated on the basis of race, gender, ethnicity, or religion, no federal claim is implicated. In short, personality conflicts between employees are not the business of the federal courts.").

The plaintiff's other conflicts in this case also arose out of romantic relationships with other boys, which caused mistreatment directed at her by the scorned, such as in Lindsey and Mandy's case.  There were also elements of personal animosity, jealousy

and dislike present.  Plaintiff's testimony solidified defendant's position that the alleged

harassment was not "on account of gender."  As to the motivations of the girls, she

testified it was related to her prior relationships with their boyfriends, Josh and Jesse,

and out of jealousy.  **Exhibit A**, p. 13-15, 33-34, 37.  Plaintiff's mother also testified

that she thought the harassment was motivated out of jealousy, due in part to the fact

that the plaintiff was attractive. **Exhibit B**, p. 30, 35-36, 57. Plaintiff's best friend

Nicole's testimony was in accord and she testified the treatment was not due to the

fact that the plaintiff was a girl.  **Exhibit J**, pp 10,. 25, 26-27, 48-49, 53.  Thus the

alleged conduct at issue was not directed at the plaintiff because of her female status,

but because all the girls had dated the same boys.  Friends of the "main" perpetrators

were motivated out of solidarity to their friends.  In addition, plaintiff testified that at

least one of the girls, Katrina, didn't' like her "attitude" and thought she was

"conceited". **Exhibit A**, p. 18-19.

Thus, in light of the caselaw and evidence in this case, defendants are entitled

to summary judgment on the Title IX claim.

2. Notice

The defendants can only be held liable for incidents of sexual harassment of

which it had actual notice.  Davis, supra. The Complaint alleges that on March 29,

2001, and in April 2001, she was sent threatening and vulgar emails.  However, by

that time, L.S.' parents had given up on the school system and did not notify them of these events. **Exhibit B,** pp. 102-104.

  3. <u>Severe and Pervasive Hostile Environment Which Systemically Deprives a Student of Education.</u>

  When viewing whether sexual harassment has occurred, the Court is required to look at the constellation of circumstances surrounding the offending behavior.  In this case, the context is high school, when children are generally 14-18 years old. Teenagers are no modicum of civility, and this must be taken into account in assessing what is actionable under Title IX and for what a board of education should be monetarily liable for.   The defendants would venture to guess that the plaintiff would concede that it would be impossible for a school district to purge the hallways of profane, rude, offensive conduct by an immature teenage population.

  As the court in <u>Davis</u> noted, there are differences between the school environment and the work environment.  What conduct may cross the threshold in a work environment will not necessarily support Title IX liability.  Teenagers are immature, and so their behavior cannot be judged on a standard of a reasonable adult. Again, the cases of <u>Benjamin</u>, <u>supra</u> and <u>Burwell</u>, <u>supra</u>, are instructive.  The district court judges in both those cases found that the terms "bitch", "whore"  and "slut" may state a claim when directed by an adult co-worker or in an adult workplace, but was insufficient to show a severe and pervasive hostile high school environment.

In addition, the specific locations of the conduct must be analyzed to determine

whether the student has suffered a systemic deprivation of the educational process.

As explained by the <u>Davis</u> Court:

> Moreover, the provision that the discrimination occur "under any education program or activity" suggests that the behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity. Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment. By limiting private damages actions to cases having a systemic effect on educational programs or activities, we reconcile the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior, realities that Congress could not have meant to be ignored.

<u>Davis</u>, supra, 526 U.S. at 652-653.

In this case, the specific instances recalled by the plaintiff occurred many

times after school hours and off school premises, such as in the instances of

nasty emails and phone calls.  None of the perpetrators were in any of the

plaintiff's classes, except for Katrina, who was in plaintiff's chorus class. Unlike

the plaintiff in <u>Davis</u>, none of the perpetrators made comments to the plaintiff

during her instruction in class.  Plaintiff does not allege Katrina interfered with her

participation in chorus.  To the contrary, plaintiff testified that they worked out

their differences.  **Exhibit A**, p. 18-19.  Plaintiff does claim that there were

problems in the lunch room, in which upper classmen and lower classmen were mixed.  As a result, the plaintiff would eat lunch in the office and help the school secretary, which was permitted by the administration. There were times where the plaintiff was teased which was not "severe" harassment as testified to by her mother, and times during that year in which things quieted down.  **Exhibit B**, 77-78.

The plaintiff's grades were almost all A's and B's.  **Exhibit I**.  A couple of her exam grades are lower than her averages, but she generally does not do as well on exams.  **Exhibit B**, p. 16.  If she was talking to an administrator, and she missed a class, it could show up as a tardy or absent.  **Exhibit F**, p. 66-67. In Mr. Hoffman's experience, 15 days absent and 9 times tardy was not significant. **Exhibit G**. p. 49.  The policy was that if a student was absent 10 days or 20 days for a year long course they could lose their credit for a class, and a teacher was supposed to submit a warning notice halfway through the attendance issue. There is no evidence this occurred.  However, even if a course credit was in jeopardy, the principal would have the authority to reinstate the credit. Id., p. 51. Plaintiff did not lose any credit, however.  **Exhibit I.**  She was promoted to 10th grade.  **Exhibit A**, p. 80.  She played field hockey, attended a chorus trip, participated in Future Business Leaders Club and was not excluded from her classes.  Id., p. 41-46, 77-78, 80.

In addition, a survey of cases finding liability under Title IX have dealt with more egregious conduct.  See Burwell, supra, citing Davis, 526 U.S. at 633-635 (sexually suggestive behavior, attempting to touch breasts and genital area, rubbing plaintiff and making vulgar statements; Vance v. Spencer County Public School District, 231 F.3d 253, 259 (6th Cir. 2000)(female student repeatedly propositioned, groped and threatened and was also stabbed in hand, held by boys while another grabbed her hair and started yanking off her shirt;) Murrell v. School Dist. No. 1, Denver, Colo., 186 F.3d 1238 (10th Cir. 1999)(disabled female student sexually assaulted on multiple occasions); Snelling v. Fall Mountain Regional School Dist. 2001WL27975 (D.N.H. 2001)(Attached as **Exhibit S**) (widespread peer harassment, both verbal and physical which involved referring to the plaintiff as a homosexual, as well as some harassment by coaches occurred on school property during school hours)

Plaintiff's experiences fall short of these other cases.

4. Deliberate Indifference

There is no allegation in the complaint that the defendants showed deliberate indifference to plaintiff's complaints of harassment, as required under the Davis standard.  The United States Supreme Court in Davis held that a school district "must merely respond to known peer harassment in a manner that is not clearly unreasonable. This is not a mere 'reasonableness' standard'".  Davis, supra, 526 U.S. at 648. The Court also explained, "In an appropriate case, there is no reason why

courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could

not identify a response as not 'clearly unreasonable' as a matter of law. Id. at 649.

In Hayut v. State University of New York , 352 F.3d 733, 751 (2d Cir. 2003), the

Second Circuit explained this standard:

> The Supreme Court has held that Title IX's requirement of an "adequate
> response" is violated not only if school officials render no response, as alleged
> by Hayut, but also if the response that is rendered "amount[s] to deliberate
> indifference to discrimination." *Gebser,* 524 U.S. at 290, 118 S.Ct. 1989; *see*
> *Davis,* 526 U.S. at 642, 119 S.Ct. 1661 (the educational institution "could be
> liable for damages only where the [institution] itself intentionally acted in clear
> violation of Title IX by remaining deliberately indifferent to acts of ... harassment
> of which it had actual knowledge."). Deliberate indifference may be found both
> "when the defendant's response to known discrimination 'is clearly
> unreasonable in light of the known circumstances,' " *Gant v. Wallingford Bd. of*
> *Educ.,* 195 F.3d 134, 141 (2d Cir.1999) (quoting *Davis,* 526 U.S. at 648, 119
> S.Ct. 1661), and when remedial action only follows after "a lengthy and
> unjustified delay," *Bruneau v. South Kortright Cent. Sch. Dist.,* 163 F.3d 749,
> 761 (2d Cir.1998).

The evidence shows that the defendants did not act with deliberate indifference

in this case.   While Mr. Hoffman admitted his oversight in not informing plaintiff's

teachers on the first day of her plaintiff's concerns, it does not appear that anything

occurred until October 30, 2000, which was the pushing incident with Lindsey, over

plaintiff's involvement with Lindsey's boyfriend Jesse.   While Dr. Gallucci and Mr.

Hoffman, in hindsight, thought that Lindsey should have been suspended in addition to

being kept out of school pending a conference with her parent, this shows negligence

at most and not a conscious disregard of plaintiff's complaint.   Mr. Hoffman's

disciplinary decision was reviewed by the principal, upon plaintiff's complaint.  The

Superintendent was involved in the plaintiff's complaint about Mr. Hoffman's use of

inappropriate language, and Mr. Hoffman was spoken to by Dr. Gallucci for his

language.  **Exhibit U**.  Lindsey was reprimanded.  **Exhibit H**.  Katy and Josh received

suspensions.  **Exhibit H, Exhibit D**.  An investigation occurred on plaintiff's

complaints.  **Exhibits H, F, and G**.  Katrina was reprimanded.  **Exhibit H**.  The posters

were removed and a thorough investigation commenced. However, there were no

witnesses and the state police would not release the report.  **Exhibits F, G, N, O**.  Dr.

Gallucci met with the plaintiff's parents whenever requested, or even when a parent

came to his office unannounced. **Exhibit F, p.** 26, 29-30, 36. The plaintiff was

provided with a copy of the Title IX policy upon request.  **Exhibits L** and **M**.  Plaintiff

was aware of the Title IX policy, but decided not to file a Title IX complaint with OCR or

Dr. Matusiak, the Title IX coordinator.  **Exhibit  B**, p. 121-122.  The Superintendent

and Dr. Gallucci met with the plaintiff's parents at the end of the year upon request,

regarding their complaints. **Exhibit H**.  Superintendent Matusiak sent plaintiff a letter

for another meeting prior to the commencement of her 10th grade year.  **Exhibit T**.

When Dr. Gallucci was informed there was still graffiti in the bathroom, he painted it

over himself.  **Exhibit H, Exhibit F**.  He told the custodians to check it everyday, and

he also checked the bathroom.  Id.  Assistant Principal Dickau had initially informed

the custodians to remove the graffiti and had been informed that it was done.

**Exhibit H**.

The evidence thus shows that the administration's responses were not clearly unreasonable. The deliberate indifference standard "makes a school district liable only where it has made a conscious decision to permit sex discrimination in its programs, and precludes liability where the school district could not have remedied the harassment because it had no knowledge thereof or had no authority to respond to the harassment." Murrell v. School Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1246 (10th Cir. 1999). For all these reasons, defendants are entitled to summary judgment on plaintiff's Title IX count.

### C.    Plaintiff's constitutional claim brought pursuant to § 1983 in Count Four fails because Title IX provides her sole remedy.

In Bruneau v. South Kortright Central School, 163 F.3d 749 (2d Cir. 1998), cert denied, 526 U.S. 1145 (1999), the Second Circuit held that section 1983 claims are subsumed under Title IX. See also Norris v. Norwalk Public Schools, 124 F.Supp.2d 791 (D. Conn. 2000)(decided by this Court). Bruneau also held that an equal protection claim brought pursuant to § 1983 is subsumed by Title IX. Id. at 757-59. Bruneau is thus dispositive of plaintiff's claim for a violation of a right to "a safe educational environment free from sexual harassment" and that the defendants "failed to act to protect the plaintiff from physical threats and sexual harassment". Plaintiff's

claim in Count Four is predicated upon the same facts as her Title IX claim.  See

Complaint, ¶ 42 (incorporating paragraphs 1-27 which is the same factual allegations

as support for the Title IX claim in Count One).  As this Court held in <u>Norris</u>:

> Here, as in <u>Bruneau</u>, the plaintiff's section 1983 claim is based upon the same factual predicate as her Title IX claim.  See Compl. ¶40.  In essence, Norris alleges that the defendants violated her Equal Protection rights by failing to remedy the situation at the school.  Because her section 1983 claim is based on the same factual predicate as her Title IX claim, and because Bruneau held that congress, when it enacted Title IX intended to preclude section 1983 suits against non-individual defendants even where those claims are based upon constitutional rights Norris cannot maintain her section 1983 claim against the Norwalk Board of Education and the Norwalk Public Schools District.

> Thus, defendants are entitled to summary judgment on Count Four of the

Complaint.

### D.    Plaintiff's Claim of "Failure to Provide a Safe School Environment Fails as a Matter of Law.

Even if Count Four were not precluded by Bruneau under the <u>Sea Clammers</u>

doctrine, plaintiff's claim fails as a matter of law.    Count Four alleges a right to "a safe

educational environment free from sexual harassment" and that the defendants "failed

to act to protect the plaintiff from physical threats and sexual harassment".  However, it

is well-established that the Due Process Clause does not burden the state with an

affirmative duty to protect its citizens.  <u>DeShaney v. Winnebago Cty. Soc. Servs. Dep't</u>,

489 U.S. 189, 195 (1989). In <u>DeShaney</u>, a majority of the United States Supreme

Court held that nothing in the due process clause of the Fourteenth Amendment

creates an affirmative duty on the part of a municipality to "protect the life, liberty and property of its citizens against invasions by private actors." Id. at 195. Chief Justice Renquist, writing for the majority, expressly rejected the argument that "once the state learns that a third party poses a special danger to an identified victim, and indicates its willingness to protect the victim against that danger, a 'special relationship' arises between the state and victim, giving rise to an affirmative duty, enforceable through the due process clause, to render adequate protection." Id. at 179. Thus, the DeShaney Court limited any affirmative duty to protect to situations in which "the state takes a person into its custody and holds him there against his will....the affirmative duty to protect arising not from the state's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." Id. at 199-200. See, Youngberg v. Romeo, 457 U.S. 307 (1982) (substantive due process component of Fourteenth Amendment due process clause imposes duty on state to provide for safety and medical needs of involuntarily committed mental patients); Estelle v. Gamble, 429 U.S. 97 (1976) (state has constitutional duty to provide adequate medical care to incarcerated prisoners).

Caselaw abundantly supports the proposition that public school students, such as L.S., are owed no constitutional "duty to protect." Judge Goettel confronted a similar claim in Crispim v. Athanson, 275 F. Supp. 246, 295-6 (2003). In Crispim, the plaintiff alleged a violation of his substantive due process right against school officials

for physical and verbal attacks by his fellow students both on school property during

school hours, and off school property after school hours…  Judge Goettel held:

> We find here that no special relationship existed between the plaintiff and the
> state at the time of the alleged harm.  Though school attendance is compulsory
> in the State of Connecticut, see Conn. Gen. State. § 10-184, it creates a
> relationship quite different from that of a prison and inmate or mental institution
> and involuntarily admitted patient.  In Connecticut, it is up to the parents of
> compulsory-school age children to decide whether education will take place in
> the home, or in public or private school.  See. D.R. 972 F.2d at 1371.  Indeed
> we agree with the Third Circuit that the primary caretakers of compulsory –
> school-age children remain their parents, irrespective of the fact that the
> children are present in school at particular time of the day through the school
> year.  While it is clear that children of compulsory school age who attend
> school, regardless of the type of school it is, must submit to the authority of
> school officials who may engage in disciplinary control over the student, such
> restriction of freedom does not prevent the students from providing for their
> basic needs..

 See also, DeAnzona v. City and County of Denver, 222 F.3d 1229 (10th Cir. 2000)

("the 10th Circuit has held repeatedly that because schools do not provide for a child's

basic needs, schoolchildren do not have a special relationship with the

government....where the parents are still the primary caregivers for the child there is

no special relationship and no due process violation"); Soper v. Hoben, 195 F.3d 845,

853 (6th Cir. 1999) (no special relationship created by compulsory school attendance);

Wyke v. Polk County School Board, 129 F.3d 560, 569 (11th Cir. 1997) ("Wyke first

submits that, because Sean was a minor child in the custody of the school pursuant to

Florida's compulsory school attendance laws, the school had a constitutional duty to

protect him from harming himself.  We explicitly reject that contention.  Compulsory

school attendance laws alone are not a "restrain of personal liberty" sufficient to give rise to an affirmative duty of protection"); <u>Doe v. Hillsborough Independent School District</u>, 113 F.3d 1412, 1415 (5th Cir. 1997) ("We join every Circuit Court that has considered the issue in holding that compulsory school attendance in Texas, to attend seven hours of programmed education on each school day, does not create the custodial relationship envisioned by <u>DeShaney</u>"); <u>Nabozny v. Podlesny</u>, 92 F.3d 458-59 (7th Cir. 1996) ("However untenable it may be to suggest that under the Fourteenth Amendment a state can force a student to attend school when school officials know that the student will be placed at risk of bodily harm, our court has concluded that local school administrations have no affirmative substantive due process duty to protect students"); <u>Wright v. Loven</u>, 32 F.3d 538, 540 (11th Cir. 1994) (to date, every federal Circuit Court of Appeal to address the question of whether compulsory school attendance laws create the necessary custodial relationship between school and student to give rise to a constitutional duty to protect students from harm by non state actors has rejected the existence of any such duty).

In the case at bar, the defendants did <u>absolutely nothing</u> to deprive L.S. of her liberty, which could form the basis for a duty to protect.  Based on the above, summary judgment should enter for the defendants on the Fourth Count.

**E.  Plaintiff's Common Law Claims Fail as a Matter of Law.**

Should this Court choose to retain jurisdiction over plaintiff's common law

claims, they can also be disposed of on summary judgment.

**1.    Plaintiff's claim for negligent infliction of emotional distress is
barred by governmental immunity at common law and pursuant to
C.G.S § 52-557n.**

Plaintiff's negligent infliction claim is easily disposed of, as shown by the

Connecticut Appellate Court case of <u>Doe v. Board of Education</u>, 76 Conn. App. 296

(2003).  In that case, the plaintiff alleged that she was accosted and sexually assaulted

by three male students.  Plaintiff alleged that the defendant failed to provide safe and

secure educational environment for students.  Specifically, the plaintiff alleged that the

defendant did not provide an adequate number of hall monitors, did not implement a

system for ensuring that students were not roaming the halls unsupervised and did not

take steps to provide for adequate supervision of students known to have disciplinary

problems or to secure vacant rooms so that they could not be used for unlawful

purposes.

The Connecticut Superior Court had granted a motion to strike the complaint on

the basis of governmental immunity.  It was not disputed that supervision of students

was discretionary.  The issue then became whether the plaintiff was an identifiable

victim subject to imminent harm.  The Appellate Court concluded:

In the present case, by contrast, the plaintiffs have not alleged facts showing that the danger to students was limited in duration and geography.  As previously stated, the plaintiff alleges that the defendant was negligent in failing to provide an adequate number of hall monitors, in failing to implement a system for ensuring that students were not roaming the halls unsupervised, and in neglecting to provide for adequate supervision of students known to have disciplinary problems or to secure vacant rooms so that they could not be used for unlawful purposes.  She alleges that the defendant's failure to act created a situation in which she was able to be in an unsupervised classroom with other students, thus creating the opportunity for her to be assaulted….the harm in the present case potentially could have occurred any time that students traveled without permission to any unsupervised areas of the school.  Under the facts alleged, therefore, it would not have been apparent to the defendant that its discretionary policy decisions subjected students to imminent harm.

Id. at 304-5.

Thus, defendants are entitled to summary judgment on the basis of governmental immunity on plaintiff's common law negligence claim.

> **2.**    **Plaintiff's Claim for Intentional Infliction of Emotional Distress is Barred by Governmental Immunity at Common Law and Pursuant to C.G.S. § 52-557n.**

The law is also clear that a municipal entity is not liable for intentional torts.

Pane v. Danbury, 267 Conn. 669 (2004).  Therefore, plaintiff's common law claim for intentional infliction of emotional distress fails as a matter of law.

## III.    CONCLUSION

It is not conceded that the offensive behavior alleged in this case is condoned by school officials or permitted when it occurs.  Rather, the evidence shows that investigations were instituted, discipline was given and efforts made on plaintiff's

behalf.  Despite the plaintiff's displeasure with the measures taken, she is simply not entitled to a monetary recovery from the board of education for her emotional upset arising out of her peer relationships while a freshman at New Fairfield High School.

DEFENDANTS,
NEW FAIRFIELD HIGH SCHOOL, NEW
FAIRFIELD BOARD OF EDUCATION,
CHRIS HOFFMAN AND JOSEPH
GALLUCCI, IN THEIR OFFICIAL
CAPACITY


By  /S/ Melinda A. Powell
    Melinda A. Powell
    Howd & Ludorf
    65 Wethersfield Avenue
    Hartford, CT  06114
    (860) 249-1361
    (860) 249-7665 (fax)
    E-Mail:  mpowell@hl-law.com

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 3rd day of August, 2005.

Lawrence W. Berliner, Esquire
Klebanoff & Phelan, P.C.
433 South Main Street, Suite 102
West Hartford, CT  06110

John K. McDonald, Esquire
Kernan & Henry
207 Bank St, 4th Floor
P.O. Box 2156
Waterbury, CT 06722-2156

  /S/ Melinda A. Powell
Melinda A. Powell