UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| L.S. AND MR. AND MRS. F.S. : | |
| : | NO.: 3:02CV1386 (SRU) |
| v. : | |
| : | |
| NEW FAIRFIELD HIGH SCHOOL, : | |
| NEW FAIRFIELD BOARD OF : | |
| EDUCATION, CHRIS HOFFMAN AND : | |
| JOSEPH GALLUCCI, IN THEIR : | |
| OFFICIAL CAPACITY : | AUGUST 3, 2005 |

**DEFENDANTS' LOCAL RULE 56a1 STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE**

The defendants respectfully submit their statement of material facts not in dispute, in support of their motion for summary judgment.

1.  The plaintiff was a freshman at New Fairfield High School during the 2000-2001 school year. Complaint.

2.  There is no allegation the defendants were "deliberately indifferent" to the plaintiff's complaints of harassment. Id.

3.  Dr. Gallucci was the principal at New Fairfield High School for one year, the 2000-2001 school year. **Exhibit F**, p. 10.

4.  Prior to that time he was the principal of the Lyman Memorial High School from 1978 to 2000. Id., p. 11.

5. While the principal at New Fairfield, Dr. Gallucci maintained an open door policy. Id., p.16.

6. If someone had a concern, he would try to meet with them that day. Id.

7. He has had training in sexual harassment numerous times. Id., p. 20.

8. He recalls the plaintiff from when he was principal. Id., p. 24.

9. Mr. Hoffman testified regarding his involvement with the issues plaintiff was experiencing. **Exhibit G**.

10. Mr. Hoffman was the assistant principal for the high school during 2000-2001 school year. **Exhibit G**, p. 8.

11. He was employed by the school district for 33 years, having begun as a classroom teacher. Id., p. 7-8.

12. Mr. Hoffman received ongoing training with regard to evaluation and supervision of the professional staff, special education, and annual training in sexual harassment. Id., p. 12-13.

13. Mr. Hoffman has also received sexual harassment training. Id., p. 87-88.

14. With regard to the school district's Title IX policy, the students were informed of it in the handbook and first day of orientation. Id., p. 63.

15. The plaintiff's parents did not ask for the policy prior to November 2001. Id., p. 65.

16. He provided the policy in response to Mr. S's request. **Exhibit L**, Letter from Mr. S requesting Title IX policy dated October 18, 2001; **Exhibit M**, Memo to Mr. S from Mr. Hoffman enclosing Title IX policy dated November 1, 2001.

17. School administrators have discretion in enforcing discipline policies. **Exhibit G**, p. 66.

18. Mr. Hoffman recalls a meeting with Mr. S over concerns about L.S.'s transition into high school due to some social difficulties in middle school. Id., p. 14-15.

19. He was not shown any emails. Id., p. 15-18.

20. Mr. Hoffman thought that L.S. had been picked on by high school kids while she was in middle school and plaintiff's parents wanted him to be aware of that. Id., p.19.

21. He did not recall that the parents relayed any "threats" by another student. Id., p. 24.

22. He told the plaintiff's parents he would advise L.S.'s teachers about their concerns of being teased by high schoolers in middle school, but did not. Id., p. 26-27.

23. The main perpetrators of plaintiff's claimed harassment were Lindsey D'Angelo, Josh Norris and Mandy Hayes. **Exhibit A**, p. 11.

24.    The plaintiff's problems began in October 2000 when the plaintiff began dating Lindsey's ex-boyfriend, Jesse Hinkley.  **Exhibit A**, p. 13.

25.    The administration was off campus at the time of the incident.  **Exhibit F**, p. 24-25; **Exhibit G**, p. 35-36.

26.    The Assistant Principal's phone rang and he and the other assistant principal returned to school to investigate.  **Exhibit F**, p. 25.

27.    When he returned he talked with the teacher that was in charge of the building about that incident.  **Exhibit G**, p. 36.

28.    The school officer, Officer Farina, had informed Lindsey and her parents and advised she would be excluded from school until the administration talked to her. Id., p. 37.

29.    Mr. Hoffman met with Lindsey and her parents the following morning. **Exhibit H**; See also, **Exhibit U**, Memo to Superintendent Matusiak from Dr. Galucci dated 11/17/00.

30.    He determined to give a strong warning to Lindsey.  **Exhibit G**, p. 25.

31.    Mr. Hoffman also scheduled a meeting with Lindsey and the plaintiff to try to mediate between them.  **Exhibit F**, p. 26.

32.    The plaintiff's parents decided to attend. Id.

33.    Dr. Gallucci also personally met with L.S. about issues she had. Id., p. 26.  However, in most cases, the plaintiff's father would come see Dr. Gallucci. Id.

34.    Mr. S relayed the role playing meeting when Mr. Hoffman was trying to mediate between the girls to Dr. Gallucci, advising Dr. Gallucci that Mr. Hoffman had used language similar to that used by the girls.  Id.

35.    Based upon this complaint, Dr. Gallucci spoke with Mr. Hoffman and expressed that he did not condone that type of verbiage.  Id., p. 27.

36.    Mr. Hoffman agreed his behavior was inappropriate at that time.  Id., p. 27.

37.    Mr. S was also concerned that Lindsey had not been given any sterner discipline, and Dr. Gallucci agreed.  Id., p. 28

38.    Dr. Gallucci advised both Mr. Hoffman and the Superintendent Dr. Matusiak that in his opinion, Lindsey should have been suspended.  Id., p. 28; **Exhibit U**.

39.    Mr. Hoffman, in retrospect, agreed.  Id.

40.    However, due to the fact that another week had transpired, and there were no further reports about Lindsey, the administration determined Lindsey should not be suspended at that time.  Id., p. 29; See also **Exhibit U**.

41.    Dr. Gallucci also saw Mr. S whenever the plaintiff would call him on the phone requesting to come in to his office.  Id., p. 30.

42. Plaintiff's problems with Lindsey were due to Lindsey's disapproval of L.S. dating Lindsey's ex-boyfriend, Jesse Hinkley. **Exhibit A**, p. 13-14. Lindsey dated Jesse on and off for 2 years. **Exhibit C**, Deposition of Lindsey D'Angelo, p. 14-15.

43. There was no other reason for the plaintiff and Lindsey's problems other than Jesse. **Exhibit A**, p. 15.

44. Lindsey was unpleasant to many people. Deposition of Josh Norris, **Exhibit D**, p. 14.

45. She referred to herself as a "bitch" and was a "bitch" to many people. **Exhibit C**, p. 50.

46. She didn't like L.S. **Exhibit C**, p. 44.

47. The plaintiff was very pretty and received attention from the older boys in school. **Exhibit B**, 30, 35-36. This sparked jealousy by the older girls. Id. at 57.

48. Mr. S came in unannounced to Dr. Gallucci's office and said that he wanted a student arrested for breaking into plaintiff's locker and throwing his daughters books around the city. **Exhibit F**, p. 44.

49. Mr. S thought Lindsey had done it, but had no evidence of it and after investigating, the administration was unable to confirm it. Id., p. 44-45.

50. There was insufficient evidence pointing to the perpetrator of the locker vandalization for disciplinary purposes. Id., p. 60.

51. The plaintiff and Josh dated in 8th grade and on and off when plaintiff was in 9th grade. **Exhibit A**, p. 16; **Exhibit D**, p. 9-10.

52. Dr. Gallucci also recalls the incident with Josh Norris. **Exhibit F**, p. 31.

53. The plaintiff was waiting for him in the hallway and she made comments to him. He made comments back. She rushed him and Josh pushed her back. Id.

54. The plaintiff immediately called her father, and Mr. S arrived, walked into Dr. Gallucci's office and demanded that Josh be arrested. Id.

55. Dr. Gallucci investigated the incident for the next couple of hours, including the plaintiff, Josh and several witnesses. Id., p. 31. Josh was arrested. Id., p. 32. Josh was suspended for the pushing incident in the hallway. **Exhibit G**, pp. 73, 102., Josh Depo, pp. 15, 37.

56. Josh and the plaintiff often argued and "exchanged words" on almost a daily basis that year. **Exhibit D**, pp. 20, 27, 29-30. Plaintiff would call him an asshole, scumbag, cock or anything she could think of. Id., p. 55.

57. Josh was repeatedly called down to the office at the request of the plaintiff.

58. He received detentions and a suspension.

59. The plaintiff would report him to the administration for "looking her way." Id., pp. 14-17, 35-37.

60. Katrina Russell at first disliked L.S. because she thought L.S. was "conceited." **Exhibit A**, p. 18-19.

61. Plaintiff reported an incident that she paraded in front of her with a photo pinned to her chest making disparaging remarks about a "pretty woman". **Exhibit H**.

62. The Plaintiff felt the display was directed at her and that on another occasion, a different group of girls were "laughing at her". Id.

63. Mr. Hoffman took the names of those students and investigated. Id.

64. They were told to cease that behavior, as it was disrespectful and inappropriate. Id.

65. They agreed not to repeat the behavior. Id.

66. The two girls later worked out their difficulties and Katrina was nice to L.S. after that. **Exhibit A**, p. 18-19.

67. Mr. Hoffman recalls that there was a graffiti problem with references to L.S. which was presented to him later in the school year. **Exhibit G**, p. 55-56. He was not prior to that time, asked to investigate it. Id., p. 59.

68. Earlier in the school year, Dr. Gallucci had asked Mr. Dickau to take care of the graffiti problem. **Exhibit H**.

69. Mr. Dickau advised the custodial staff to paint over it and was advised it was completed. Id.

70. Mr. S at the end of the year, advised Dr. Gallucci that there was graffiti in the bathrooms. **Exhibit F**, p. 46.

71. That day or the following day, Dr. Gallucci removed the graffiti himself and what ever else was there on the bathroom walls. Id., p. 46.

72. Mrs. S thanked him for taking care of it so quickly. Id., p. 59.

73. After he sprayed the graffiti, he brought a custodian to the bathroom and showed him and instructed the custodian to check it every day. Id., p. 98

74. Dr. Gallucci also checked it everyday until school ended. Id.

75. The plaintiff engaged in similar behavior with the other students, using profanity and other slurs like asshole, scumbag, cock, bitch, whore. **Exhibit D**, p. 55-56; **Exhibit J**, p. 59-60.

76. In November 2000, the plaintiff had on her online profile that "cheerleaders are Dancers gone RETARDED" and under marital status, "Jesses Girl". **Exhibit J**.

77. In November 2000, the plaintiff's best friend, Nicole, had on her online profile, "Party hardy, drink Bacardi, shake that as done smoke grass remember the kiss remember those nights we're all gonna miss, partyin' is fun, so f*ck the skanks of 2001, but 2002 are whor*s its true, our like is good, sex id free, like all those bitches of 2003, smack the whor*s, grab the pimps, shut the door before you score, love the class of 2004." Id.

78. Dr. Gallucci received a complaint about the plaintiff and Nicole's profiles. **Exhibit F**, p. 39.

79. He asked Mr. S to come to the office and the plaintiff was also in attendance, and admitted to making the profile. Id., p. 40.

80. Her friend Nicole had written some sexual innuendos about the upper classmen. Id., p. 40.

81. During that school year, Dr. Gallucci had also received complaints about the plaintiff's friend, Nicole, that she had performed oral sex for football players. Id., p. 97.

82. The plaintiff initiated consternation with other students and other students created problems with her. **Exhibit F**, p. 93.

83. The administration was not aware of an instance where the plaintiff was thrown food at in the cafeteria. **Exhibit G**, p. 71.

84. The administration was not aware of emails the plaintiff received late that school year. **Exhibit B**, pp. 102-104.

85. Dr. Gallucci was not shown any threatening emails by the plaintiff. **Exhibit F**, 38.

86. Mr. S told Dr. Gallucci he would get him a copy of a harassing email sent to the plaintiff, but never did. Id., p. 34.

87. Mr. Hoffman was called upon by Dr. Gallucci to investigate a poster that was posted in the school showing the plaintiff and her friend Nicole, which included profane language. The administrators pointed their investigation toward Mandy Hayes, but were unable to find any witnesses or conclusive evidence against her to warrant discipline. **Exhibit G**, p. 79-80; 100-101.

88. The investigation included interviewing students, interviewing Mandy extensively and attempting to get the police report from the state police. Id., p. 100-101.

89. Regarding the poster incident, Mr. S again arrived to school and demanded that a student be arrested. **Exhibit F**, p.32.

90. Mr. S identified a couple of names for the administration to interview, which was done. Id., p. 33.

91. Those students, however, reported that they did not see anything. Id.

92. Dr. Gallucci questioned the suspected student who put up the poster and also met with her parents. Id., p. 33.

93. Others were also investigated. **Exhibit E**, Deposition of Mandy Hayes, p. 18-21.

94. Mandy denies making the poster. Id., p. 29-30.

95. The parent advised that she wanted a lawyer present and told Dr. Gallucci he was violating her [daughter's] rights. **Exhibit F**, p. 33

11

96. Mr. S said he would get an email that was sent to the plaintiff. However, he never produced any email. Id., p. 34.

97. However, the police denied the administration the police report. Id., p. 101. See also **Exhibit O**, Letter from Susan Revoir to Dr. Gallucci dated 7/3/01.

98. Dr. Gallucci requested, but was unable to obtain, the police report which plaintiff claimed concerned Mandy Hayes' involvement with the posters. **Exhibits F**, p. 34; 35-36, 100-101; **Exhibit N**, Letter to Susan Revoir from Dr. Galucci dated 6/27/04; **Exhibit O**, Letter from Susan Revoir to Dr. Gallucci dated 7/3/01, **Exhibit P**, Letter to Mr. S from Dr. Gallucci dated 7/3/01; **Exhibit Q**, Memo to Dr. Matusiak dated 7/3/01.

99. He advised Mr. S he was denied access. **Exhibit F**, p. 36; **Exhibit P.**, Letter from Dr. Gallucci to Mr. S dated 7/3/01.

100. Plaintiff's problems with Mandy were due to the fact that Mandy's boyfriend talked to L.S. in middle school. **Exhibit A**, 33-34, 37. Mandy never liked L.S., even in middle school. Id.

101. Mandy also disliked L.S.'s best friend, Nicole Marvin. Id., p. 34.

102. Mandy had no classes with the plaintiff. **Exhibit E**, p. 14-15.

103. Katy Johnson was suspended by Mr. Hoffman for her statement to Nicole Marvin outside of the plaintiff's presence, that she was going to kill the plaintiff. **Exhibit G**, p. 72; See also Complaint.

104. There were about eight or nine incidents. **Exhibit J**, Deposition of Nicole Marvin, p. 9. All of the students but one identified by the plaintiff were upperclassmen or not in the 9th grade. **Exhibit A**, p. 63. All of the students except one were not in any of L.S.'s classes. Id.

105. L.S. would call home first before letting the administration know about a complaint. **Exhibit F**, p. 60

106. Their modus operandi was to have the father come down and demand that someone be arrested. Id.

107. This is the only case Dr. Galucci has seen where the student would call home first. Id., p. 63.

108. Dr. Gallucci met with the plaintiff's parents whenever requested or even when a parent came to his office unannounced. Id., pp. 26, 29-30, 36.

109. There was training held on anti-bullying that year, because new Fairfield was one of the leaders leading the cause of anti-bullying. Id. p. 85-86.

110. The remedial measures were effective. **Exhibit F**, p. 94.

111. It was also normal to see students, including the plaintiff, helping a secretary with administrative tasks. **Exhibit F**, p. 95. Other students also helped the secretary. Id.

112. Sometimes despite investigation, the administration was unable to confirm plaintiff's allegations, and the plaintiff would offer no concrete evidence that pointed to a particular student for the administration to discipline. **Exhibit F**, p. 55; **Exhibit J**, p. 16.

113. The plaintiff participated in field hockey, the Future Business Leaders of America club, chorus group, including a trip to Florida with the chorus group during her freshman year. **Exhibit A**, p.80

114. Mr. S met with the Superintendent in June 2001. **Exhibit F**, p. 29-30. Dr. Gallucci was also in attendance. Id.

115. Dr. Matusiak followed up with Mr. S to schedule an appointment concerning the plaintiff's return for 10th grade.  **Exhibit T**, Letter to Mr. S from Dr. Matusiak, dated September 4, 2001.

        DEFENDANTS,
        NEW FAIRFIELD HIGH SCHOOL, NEW FAIRFIELD BOARD OF EDUCATION, CHRIS HOFFMAN AND JOSEPH GALLUCCI, IN THEIR OFFICIAL CAPACITY

        By /S/ Melinda A. Powell
          Melinda A. Powell
          ct17049
          Howd & Ludorf
          65 Wethersfield Avenue
          Hartford, CT  06114
          (860) 249-1361
          (860) 249-7665 (fax)
          E-Mail: mpowell@hl-law.com

**CERTIFICATION**

     This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail, to the following counsel of record this 3rd day of August, 2005.

Lawrence W. Berliner, Esquire
Klebanoff & Phelan, P.C.
433 South Main Street, Suite 102
West Hartford, CT  06110

John K. McDonald, Esquire
Kernan & Henry
207 Bank St, 4th Floor
P.O. Box 2156
Waterbury, CT 06722-2156

                                                             /S/ Melinda A. Powell
                                                             Melinda A. Powell