UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

L.S. AND MR. AND MRS. F.S.,  :
Plaintiffs                   : Civil Action Number
                             :
                             : 3:02CV1386(SRU)
vs                           :
                             : FEBRUARY 18, 2004
NEW FAIRFIELD HIGH SCHOOL,   :
NEW FAIRFIELD BOARD OF       :
EDUCATION, CHRIS HOFFMAN     :
AND JOSEPH GALLUCCI,         :
IN THEIR OFFICIAL CAPACITY,  :
Defendants                   :

-----------------------------------------------------------
           Deposition of: LYDIA STOLFI
-----------------------------------------------------------

   Taken before Teri A. Dougan, Notary Public/Stenographer for the State of Connecticut, at the office of Howd & Ludorf, 65 Wethersfield Avenue, Hartford, Connecticut 06114, on February 18, 2004, commencing at approximately 2:38, p.m.

                    Teri A. Dougan
                    Court Reporter
                    LIC. #00217

```
 1    A.   No.
 2    Q.   She just spoke?
 3    A.   Yes.
 4    Q.   What did she say?
 5    A.   Just hurtful comments like all the rest.  I
 6  mean, I don't remember exact quotes that came out
 7  of her mouth.
 8    Q.   And now were any of these girls in any of
 9  your classes or were they all older?
10    A.   Tara was the only one that was in my
11  classes.
12    Q.   That would be Tara Richardi, and that is
13  the chorus class?
14    A.   Yes.
15    Q.   Rachel Rodriguez, Jessica Mansurian, Katy
16  Johnson, Teresa Carvella and Katrina Russell were
17  all upperclassmen who were not in any of your
18  classes?
19    A.   Yes.
20    Q.   Are any other names that come to mind that
21  would be a person who was a student at New
22  Fairfield that you had difficulty with during your
23  9th grade year that we have not spoken about
24  already?
25    A.   No.
```

1  they were nasty to me all the time whenever I went
2  down there for help.
3      Q.  Who are you talking about?
4      A.  The administration.  They told me I'm there
5  too much and I have to leave and it is catty girl
6  stuff.  They could not do anything about it.
7      Q.  So they told you it is catty girl stuff and
8  they could not do anything about it.  Correct?
9      A.  Yes.
10     Q.  And you were, however, able to sit with
11 that secretary for a period of time, weren't you?
12     A.  Yes.  I went in there and she said that she
13 made it so that I could get community service and
14 can be in there during my lunch period because I
15 was afraid to eat lunch in the cafeteria because
16 every time I went in the cafeteria I had some kind
17 of confrontation with somebody.
18     Q.  Had you had any type of disciplinary
19 problems that brought you to the school
20 administration?
21     A.  Did I ever get in trouble in school?
22     Q.  Yes.
23     A.  I got in trouble once.
24     Q.  In 9th grade?
25     A.  Yes.

```
 1    Q.   And what did they do?
 2    A.   They told me I had to leave.
 3    Q.   Did they call your parents?
 4    A.   I think so.
 5    Q.   And your parents came and got you?
 6    A.   My friend's mom came and got me.
 7    Q.   Was she also an 8th grader that was there?
 8    A.   No.
 9    Q.   Let me ask you this, do you think that
10  anything the administration has done or hasn't done
11  in terms of helping you out was because the
12  administration has a thing for girls and don't like
13  to help girls?  They single girls out versus boys?
14    A.   No.  I couldn't--I don't know any
15  other--anybody else's business with the school and
16  how they disciplined really other people, except in
17  my case.
18    Q.   That kind of leads to my next question.  Is
19  there anyone that you can think of that was
20  basically in the same situation that you were in
21  and having the same types of issues and that those
22  issues were presented to the administration and the
23  administration responded differently for them than
24  they did for you?
25         ATTORNEY BERLINER:  I'm going to object
```

1   A.   Not every day, but sometimes I would sit
2   down there and try to make a complaint waiting for
3   them, but I had to go to class after a certain
4   point.
5   Q.   But was that different than saying "I
6   refuse to speak to you"?
7   A.   They never said "I refuse to speak you",
8   but when I would say something they would say there
9   is nothing I can do about that.
10   Q.   What do you remember specifically saying to
11   them that they responded there is nothing they
12   could do about that?
13   A.   People saying things to me.
14   Q.   All right.  And the people would be some of
15   the members of this list we have gone through?
16   A.   Yes.
17   Q.   Lindsey D'Angelo's friends?
18   A.   Uh-huh.
19   Q.   You have to say yes.
20   A.   Yes.
21   Q.   Tell me about Assistant Principal Hoffman,
22   when did you have a moment where he made a
23   reference to catty girls and things like that?
24   A.   A lot.  I don't remember the exact time
25   again, but when I would complain about stuff.

1   Q.   Well, let me ask you this, there are many
2   events that we described and I have talked about
3   with your mother that I would consider to be
4   serious and you told me, however, there were many
5   more complaints than that, you had a complaint
6   almost every day.  Do you in your opinion believe
7   that some of the issues that were going on were
8   just catty girl stuff and not the type of thing
9   that merited a suspension or discipline?
10  A.   Regardless if it deserved a suspension or
11  not, not every case they deserve a suspension, but,
12  I mean, it obviously led to bigger things where it
13  did deserve that and it could have been stopped.
14  They could have been brought in and talked to and
15  said if they did something like that again it could
16  happen or gotten a detention.  It didn't have to go
17  as far as a suspension.
18  Q.   I understand. And that's really your
19  theory about it all.  I'm wondering what you feel
20  about some of it, some of the days what was going
21  on was in fact catty girl stuff.  Is that a fair
22  statement?
23  A.   No.
24  Q.   Not one day was it catty girl stuff?
25  A.   No, because I don't think it is fair

**Magdalena P. Capasso**

| | |
|---|---|
| **From:** | Alderson, Linda [LINDA.ALDERSON@Lennoxintl.com] |
| **Sent:** | Thursday, September 22, 2005 9:25 AM |
| **To:** | Magdalena P. Capasso |
| **Cc:** | Philip T. Newbury; Bishop, Lisa - ESIS |
| **Subject:** | RE: Hilderbrand and Chubb Ins. a/s/o |

I disagree that reports from Mr. Nye or Mr. Pickle are appropriate at this stage of this case. We have never done so in the past and I see no reason to do so in this case. Strategically I would strongly recommend against this. I simply wanted to be sure there was no other evidence which should be retained as this scene is going to be spoiled. It is clear Chubb and C & C plan to make a case against ADP and the AHU. This is a sizable loss from a damage standpoint.

-----Original Message-----
From: Magdalena P. Capasso [mailto:mcapasso@hl-law.com]
Sent: Thursday, September 22, 2005 8:21 AM
To: Alderson, Linda; Bishop, Lisa - ESIS; Philip T. Newbury
Subject: RE: Hilderbrand and Chubb Ins. a/s/o

Dear Ms. Alderson:

As stated in our interim report, Mr. Ney confirmed that the fire started in the proximity of the subject AHU. The fire burned in this vicinity and was contained to this particular area. Specifically, the area consists of a portion of a room located on the third floor of the residence (a relatively small area). The back wall, in which the subject AHU was installed, completed burned out. This exposed a portion of the ceiling on the second floor.

We have contacted Mr. Ney and asked him to prepare a written report regarding his inspection of the property. We have not received this report. Mr. Ney did indicate that it would be imperative to witness the removal of the AHU, at which time it may be possible to opine and/or confirm as to the origin of the fire.

With regard to the removal of the second AHU, Atty. Mullen is removing a fully intact AHU that he believes is most comparable to the subject AHU. He wants the parties and their experts to compare the units at the time of disassembly and/or testing. At this point, we cannot confirm the make/model of the subject AHU. We cannot confirm whether the subject AHU and the second AHU being removed are the same. The Plaintiff's installed a total of four (4) AHU in their residence. We believe that each of these AHU's was manufactured by ADP. Mr. Pickle can confirm this.

I hope this information is helpful. It may be important to obtain written reports from Mr. Pickle and Mr. Ney regarding their inspection, so that this information is readily accessible. Let me know if you would like to follow-up with them. Sincerely, Lena

-----Original Message-----
From: Alderson, Linda [mailto:LINDA.ALDERSON@Lennoxintl.com]
Sent: Thursday, September 22, 2005 8:35 AM
To: Bishop, Lisa - ESIS; Philip T. Newbury; Magdalena P. Capasso
Subject: Hilderbrand and Chubb Ins. a/s/o
Importance: High

PRIVILEGED AND CONFIDENTIAL
PREPARED FOR LITIGATION
ATTORNEY CLIENT COMMUNICATION

Ms. Bishop, Capasso and Mr. Newbury, I received a copy of the FAX your offices apparently received from C & C. They are removing two air handlers it appears. Are both of ADP's

1

manufacture? They also state that an exemplar air handler is going to be removed. From where are they going to secure this exemplar? How are they going to do that if they can not ID the two air handlers in the residence by model and serial numbers? Or do they and AMX Contracting have that information and have simply not shared the information with us? Why are they removing the air handler on the second floor if they believe the origin is on the third floor. What other evidence does Mr. Nye believe should be preserved? It is evident all evidence C & C plan to preserve relate to the air handler.

What are Mr. Nye's preliminary opinions regarding the origin of the fire? Does he agree the evidence seems to indicate the origin is at or near the ADP air handler on the third floor? Any evidence the fire originated elsewhere? It is clear the scene will be spoiled and renovations completed shortly. Again, there is no other evidence our experts believe should be preserved.

This message, including attachments, is intended for a specific individual and contains information which is confidential and legally protected. If you believe that it has been sent to you in error, please reply to the sender that you have received the message in error and delete all copies of it. If you are not the intended recipient, retention, dissemination, distribution or copying of this e-mail communication is strictly prohibited.

2

1  people.
2     Q.   Do you remember specifically what the fact
3  pattern was that was before either Dr. Gallucci or
4  Mr. Hoffman when you say the response was "that is
5  just catty girl stuff"?
6     A.   Yeah.  Them continuously harassing me in
7  the the hallway.
8     Q.   Calling you names?
9     A.   Yes.
10    Q.   I mean, was it--did he say--or did either
11 of them say that it was just catty girl stuff when
12 you complained that you were actually pushed by one
13 of them?
14    A.   No.
15    Q.   How about when Josh Norris hurt you, did
16 they say--
17    A.   No, because I didn't get to talk to them
18 when that happened.  I was talking to the officer
19 filing a complaint.  I didn't talk to the
20 principal.  I went down to the office and told them
21 what happened and the girl on the loudspeaker
22 called Josh's name down.  I didn't talk to the
23 principal.  I talked to the officer.
24    Q.   At no time did you talk to anyone on the
25 school administration about the Josh Norris

1  incident?
2  A.  No.  My dad, I believe, talked to them
3  about it after it happened, but I didn't talk to
4  them.
5  Q.  When the posters were put up, did anyone
6  say that is just catty girl stuff?
7  A.  Again, I did not talk to the
8  administration.  I went down and told them what
9  happened and they called the girls in, so it wasn't
10 like, you know, I was down there.  All I did was go
11 in with the poster and they were, like, oh, we will
12 deal with this or whatever.
13 Q.  When the graffiti went up in the bathroom,
14 did anyone say "that is just catty girl stuff"?
15 A.  Yes.  They said they could not do anything
16 about that.
17 Q.  Did they characterize that as catty girl
18 stuff?
19 A.  I'm pretty sure, yeah.
20 Q.  The graffiti in the bathroom.  "Suicidal
21 bitch" is catty girl stuff?
22 A.  The reference was used a lot.  When it
23 comes to specific each time, it may have been
24 brought up as that, but, I mean, I can't exactly
25 say.  I mean, it was three years ago.  I can't

1  remember exactly when it was said. It was a term
2  used loosely by them.
3     Q.  But you don't remember that it was
4  specifically said in response to a graffiti of
5  "suicidal bitch" specifically?
6     A.  To that specific thing that was written on
7  the wall, no.
8     Q.  I don't have any other questions. Thank
9  you.
10                DIRECT EXAMINATION
11 BY ATTORNEY SCOZZAFAVA
12     Q.  I just have a couple. Only a few minutes.
13 Let me introduce myself. For the record, my name
14 is Melissa Scozzafava, and I also represent the
15 defendants in this lawsuit. Did there ever come a
16 time while you were a student at New Fairfield High
17 School that you went to see a social worker at the
18 school about the problems you were having?
19     A.  No, I never did. The only time I saw a
20 social worker was part of the being suspended for
21 one day you had to see the school psychologist and
22 take a smoking course on how it is bad for you.
23     Q.  So the only reason you went to see the
24 school psychologist was in response to your
25 suspension for smoking?